Good morning, Your Honors, and may it please the Court, my name is Joe Klock with the firm of Epstein, Becker & Green. I represent the St. Croix Renaissance Group. I will be appearing not only on behalf of St. Croix, but also on behalf of Montrose, Mr. Cole, who is Montrose's attorney, is sitting at the Council table with my co-counsel, Mr. Joel Holt, and Mr. J.C. Antorcha. Your Honors, as you know, we have 15 minutes. It will teach us next time not to fill a box with two appeals. We're going to try to figure out how to get that down into 15 minutes, but I think it's obviously doable. We have two appeals. One is the J&S appeal, the other is Bennington, with the Court's permission, and we'd also like to reserve three minutes if we might. I speak only for myself, but having spent some time with these files, I have a sense that this may be less complicated than meets the eye. I think it is. Cut through some issues. I think it is. And since I have been involved since the beginning, I am well aware of the facts of the case. So we won't belabor that. Basically, again, if I might have three minutes for rebuttal, which may or may not be necessary. With respect to the J&S case, basically, in the J&S case, the plaintiff sought a preliminary injunction in the first instance. At the argument, we pointed out that there had been no discussion about bond and there were various other problems. The judge pointed out that obviously he wouldn't consider an injunction because there was no bond. He entered a preservation order. Do you think that's of some significance, what you just indicated, the request for relief was? Of course. Not only was that the request for relief, Your Honor, but that's what they got. It was titled preservation order, but it was an injunction. It's important to us preliminarily, is it not, because there's a question of appellate jurisdiction here. Well, Your Honor, the request from counsel was for a preliminary injunction. I believe that the appellate jurisdiction depends upon the actual nature of the order, not what it's called. It was called a preservation order, but, you know, on the duck test, it clearly is an injunction because it, number one, shuts down a plan. It's not a discovery order. It shuts down a plan. So you've got to explain to us, so as to meet the requirements of 1292A1, why this was indeed a preliminary injunction and not a preservation order. It was a preliminary injunction, Your Honor, first because the plan was shut down. The court also found us in contempt of it. The whole plan was shut down, and in fact, the district court conceded in its memorandum that this was essentially unprecedented. Did you not? Oh, yes. Yes. It indicated that it was unusual to use a preservation order in this case, but it was not, you know, it was unprecedented to do it, but it could still do it, and the preservation orders that it cited had to do with tires and fires and this, that, and the other thing. Never had to do with the nature of this thing. But if Your Honor, if Your Honor's look at the preservation order, the thing is clearly an injunction. It has all the indicia of an injunction, and indeed, the court found us in contempt of In addition to that, Judge, the other thing that's problematic that shows that it's an injunction rather than a preservation order is there's all kinds of findings of fact and conclusions of law, which is not what you find in a garden variety discovery order. In a discovery order, you just find something that would say either the court would appoint an expert or the court would allow different experts to come in. At the end of the day, what we have is a damage action, and the purpose of the drill was just to allow people to come in to do an estimate on what metal was there, what the costs were, and the like, and what it ended up being was an injunction and one that constantly changed. When it went through its third peregrination, we went up on an emergency relief, and Judge Ross, writing for the court, said that the original order had been premised on the district court finding that it would not be unfair or oppressive to the appellants because the order would not apply to structures on the GeoNet leasehold, which was a separate leasehold, and then proceeded to hold us in contempt for failure to prevent it. I'm sorry, to preserve structures on that leasehold. It then pointed out that we were held in contempt for the actions of a third party that was not under our control, and in addition to that, the court pointed out that the district court had repeatedly changed the nature and scope of the purchase order such that good faith compliance had been difficult or impossible. Then in what is somewhat unusual, the entire order was stayed and this court ordered the district judge to carry out the discovery portions of the order and to report back to this court on a regular basis. Now the order of this court is interesting because it appears that that is a continuing state of affairs and that the court has still retained jurisdiction. Now the interesting point with respect to this, Your Honor, is this, that the issue would come up and is raised by the opponents. They say, well, this thing is moot now. I mean, the preservation went back to the magistrate, they went through the discovery and the like. Why are they not correct on that? Assuming we have jurisdiction, why are they not correct on the mootness issue? Because you didn't reverse the order, Judge. You simply stayed the order. And the order has findings in that. Is the order functional in any way? Well, apparently, Judge, because as part of the settlement to the record, we've asked them to agree that it's moot and they won't do it. Well, certainly what we ordered you to do in our order, I gather, now has been done. That's correct, Your Honor. And has that inventory been paid for in full by the parties? Yes, Your Honor. But the problem is, is that there's a $5,000 a day fine that is still there. There's findings of fact and conclusions of law. And there is the issue of the prevailing party on an injunctive order. So those things are still hanging out there. And that's why we think it is still ripe for decision by the court. Obviously, the district judge below is operating in the best of faith. But, Your Honor, it's like an injunctive minefield down there. I mean, every time you go into court, there's an injunction entered. So when we finish with the J&S thing, this court enters its order. When it goes back down, we proceed with the district judge. The next thing that happens is Bennington files its action. Now, Bennington is even more interesting because here we have the district court has taken two contracts, one of which the circuit court for the 11th Judicial Circuit in Florida, a state court, on a fully adjudicated matter determined that my client was not a signatory to the contract and also that their client wasn't a signatory to the contract and that no arbitration could be compelled. Nonetheless, this group now goes back in front of the district court here again and files another lawsuit. And in this lawsuit, after some procedural niceties, they amend their complaint and now we have another injunction. The order that Judge Roth for the court stayed now reappears again. Half of it reappears now in the new injunction that has entered in the Bennington case. Now, we only have one pile of metal that we're talking about. That pile of metal is now the subject of two different lawsuits, and the district judge below is now giving relief in two different lawsuits for the same pile of metal. So what is the issue here? The issue is money, we thought. But now what we have is the district judge in the Bennington case entering an injunction after we believe the issue of the parties to the contract has been forever decided by the circuit court. How so? Explain that to me, how the Florida decision specifically resolved that issue. I'm sorry, I missed the last part of the question. Explain to me how the Florida court specifically resolved that issue. Well, let me answer it this way. The issue that went to the Florida court was whether or not arbitration could be compelled. In the process of doing that, and the other side suggested there may be some ambiguity, but they went back on a petition for a hearing in front of that judge and they put both contracts in front of the judge. The first contract, which the court had found that we weren't a party to. The reason why, Judge, the reason why there can be no arbitration is because the circuit judge in Dade County found that we're not parties to the contract. But you're not a party to the sale contract, but you are a party to the dismantling contract. Right. And what if we find there is sufficient specification in the dismantling contract that it can be enforced? Well, you have two problems, Judge. The first problem is I'm not going to tell you what you can do and not do, obviously, but the fact of the matter is it requires some judicial creativity to do that because you're missing some parties and you're missing some terms. We'd have to be activists. Pardon me? We'd have to be activists. You'd have to be activists, Your Honor. We'd have to be very, very active. You'd have to create parties and, I mean, you'd have to blend two documents, one of which has been found not to involve our people at all. And then you still have the problem of the Bennington Foods, which the judge up in Florida said was not a party to the contract, and then they went back up to the judge again on rehearing and said, oh, look at the second contract. Judge said, okay, I've looked at that one too. You're still not a party. So, I mean, they're a fried judge on that point. I mean, that has been determined for all points of time. So how the district court below, or with all due deference and respect, this court is going to be able to fill in the second document with problems for the first is difficult. The other problem is, again, in this preliminary injunction, there's nothing left to be done below. I mean, let's say, for instance, based on what has occurred here, the district court basically has decided the case already. Well, if we determine, which I think is perhaps inherent in our earlier order to get the inventory done, that this is a matter strictly of damages, and it goes back for trial, do we really need to concern ourselves at this point with who's a party to what contract? It would be helpful. I mean, you don't... Well, but isn't there some factual interpretation that's not really appropriate for a court at this level? Judge, at this point in time, our view is the issue as to whether or not Bennington and my client, St. Croix, as a party to the first contract has been decided for all time in any proceedings having to do with this matter. We believe the court properly should so find. The second thing we think the court needs to do is to reverse whatever injunctive remnants are left from the first order and reverse the second preliminary injunction because otherwise, even under a Beacon Theatre test, I mean, the judge has made all kinds of determinations. He's found that there is a contract. He's interpreted the contract. He's found out what the result is already. So what the jury is supposed to do, I don't see what a jury would do as things currently are. Now, if the court says, if we roll everything back to where we were before we entered the preservation order, we're fine, except we still think there are the matters of us being able to go and get costs and the like. And as Your Honor is well aware, the law is very clear that you have to be careful with respect to disobeying an injunction. We don't know whether we have or not. Your Honor was very helpful as far as the court was concerned when you entered the order that you did because it said that it was very difficult to understand as to what the standard was, but there's still the question of $5,000 a day. There's the question of having interpreted the contract. There's the question of having put both documents into a blender and then poured it into a cupcake dish. So those are the issues that we have. We believe that the court properly needs to do those things based on the records that stand before the court. I'd like to retain the other three minutes if I may for whatever is left. You may. You've even got a minute and eight seconds left here right now, which certainly demonstrates that 15 is adequate to cover the case. Thank you. Ms. Bolt, I believe you're next on the list. All right. That's fine. That's not the way our list reads, Mr. Arulano. May it please the court, Joseph Arulano, counsel for J&S in this appeal. Sitting at the council table is Attorney Stacey White. He is counsel to J&S in the district court but not in the circuit court. May it please the court, it's all well and good to talk about the appellant's wish list for things that he would like this court to do, but everything is predicated on jurisdiction. And I approached this issue, Judge Roth, in particular with some timidity because as I believe I said quite candidly in my opening brief or my brief to this court, I recognize that there is certainly an argument that the motions panel, sub silentio, determined that it had jurisdiction when it ordered the inventory. Nonetheless, we did file a motion to have the matter of the motion to dismiss on the issue of appellate jurisdiction referred to the merits panel and that motion was granted by the motions panel. And I would, if the court will permit, I would like to address the appellate jurisdiction of this court. At page 16 of the appellant's brief, main brief, they characterize, the argument is that the order that was entered by Judge Finch was in reality a preliminary injunction in that it was directed to SCRG and third party tenants. It's already been enforced by contempt. And number three, it was designed to protect, in italics, the substantive relief sought by the complaint in more than a temporary fashion. The entire crux of jurisdiction before this court rests on that particular argument. And I notice that, and they cite the Saudi basic case from this court, which was a decision in 2004. Saudi basic, of course, simply reiterated the task that had been previously announced by this court in Bank, in Cohen versus Board of Trustees, and then was reiterated by this court in Hershey Foods. We approached the issue of appellate jurisdiction, this court said, in Hershey Foods with the understanding that 1292A1 was intended to carve out only a limited exception to the final judgment rule. And then in what surely passes as an understatement, literalism has not been the approved canon of construction in the interlocutory appeals statute. Approaching the issue from that framework, Cohen versus Board of Trustees holds at page, I believe it's at 1464, the order must not only adjudicate some of the relief sought in the complaint, it must also be of such a nature that it grants relief that could be enforced pendante liti by contempt if necessary. The order must adjudicate some of the relief sought in the complaint. True, there is a footnote. Mr. Orellano. Yes, Your Honor. What do you make of the fact that the district court, in entering this order, conceded that the scope for a preservation order was virtually unprecedented? This court stated, a preservation order preserving an entire industrial facility until damages evidence can be gathered may be unprecedented. I understand, Judge, and that may be a true statement of fact. However, the court in the subsequent order, the order entered September 8th, specifically modified its original preservation order to say as follows, that as the inspector went and completed an inventory with respect to any particular structure, that the preservation order would thereby automatically be lifted. And that not only addressed numerous concerns that were raised by the district court, but also fits in nicely with the task that the Third Circuit enunciated, this court in Bank enunciated. What also fits in nicely is the relief granted in response to your request, which was a request for injunctive relief. Yes, I understand. It was a request for injunctive relief. It looks like a duck and quacks like a duck. Your Honor, I'd like to refer this court to page 22 of the appellant's brief. The complaint in this case, I'm quoting, the complaint in this case is entitled complaint for damages. All three counts have a wherefore clause that only seek compensatory damages, consequential damages. No other relief was requested. Going back to the test in Cohen, you have to, in order for it to be a And it must be in more than a temporary fashion. And to the extent that the district judge in the modified order of September 8th, that modified the original preservation order set, this preservation order is lifted automatically as the appraiser or the person doing the inventory certifies that the inventory has been completed with a particular structure. That order therefore became temporary. The nature of a preliminary injunction is that it endures for the balance of the case until a final judgment unless otherwise modified. This clearly was not a preliminary injunction. Was it in the nature? Did it somehow sound like a duck? Yes, Judge, maybe it sounded like a duck. And maybe it even quacked like a duck and felt like a duck. But you know what? It wasn't a duck. It's essential here, just so we put this in perspective, it is essential for you that this is not an injunction. Because if it is, there's no way this is a valid injunction, correct? I don't think it's essential for purposes of this appeal. We are arguing the motion to dismiss, and we would like to win on that basis. But there are other avenues for us to prevail in this appeal. The lack of findings on likelihood of success on the merits, the lack of findings on the issue of irreparable harm, the lack of a bond, all of that isn't troublesome to you in terms of the need to determine that it's not a preservation order? Judge, if it's not in a preliminary injunction, then there's no need for a bond. That's a circular issue. There's only a need for a bond if it's a preliminary injunction. There was no bond because it was not a preliminary injunction. That's my point. Yes. The whole line of questions was predicated on the fact that it's got to be a preservation order for your purposes. Because if it ain't, it's not a valid injunction order. with respect to this argument that the court lacks appellate jurisdiction. But we also have other arguments, Your Honor, in the conclusion of their brief. They're the appellants. They get to frame the issues on appeal, not us. This is what they said. This court's action set the inventory on its way and has now been completed. The only issue that remains are SCRG's costs associated with the inspection as a result of the preservation order that was improperly issued. We took them at their word. In my opening of my brief, I put a preamble, and I said, that's the issue before this court. This is what we are addressing. And I showed in our brief, based upon the record, they unilaterally paid the GO Industry people. They entered into retainer in spite of Judge Finch's order, that order that the parties cooperate. And if they couldn't cooperate, they go in front of the magistrate. Was not GO Industries on your list of acceptable persons to do the inventory? Yes, Your Honor. And SCRG filed a first information motion. What's the problem? Well, the problem was they unilaterally went ahead and signed them up. Because you wouldn't cooperate with them. Your Honor, that was two days. They did this in two days that wasn't based upon lack of cooperation. What they did was they wanted GO Industries to understand that they were looking to SCRG for payment, and that, in effect, they were their client. They were their retained expert. In any event, they signed them up. They voluntarily agreed to pay those costs. How can they come to this court and say, you know, we asked for an appeal. How could you complain that GO Industries was not an appropriate entity to do the inventory? We said they were appropriate. The problem was, from GO Industries' point of view, when they were signed up by SCRG, which guaranteed their fees, they started taking instructions from SCRG. They didn't understand that this was a joint enterprise and that the court was ordering that they had two masters, in effect, not just one master. Did your clients go and explain to them that it was a joint enterprise? I believe they did, but the retainer had already been signed. They signed that retainer, and it showed as part of the second informational motion, which was filed two days after the first informational motion, which pledged cooperation with all parties in the court and said they were going to faithfully follow the order of the court, which had ordered cooperation. With respect to Globex, Your Honors, they sent a letter to Judge Cannon. They said, even though we're not ordered to, we agree to split the costs. That's what they said, so the magistrate took them at their word. Was the magistrate wrong in doing so? He was ordered by this court to consult with the parties first before he entered an order, and that's exactly what he did. And on November 9th, they had a conference. I wasn't part of it, Your Honor, but the record reflects. They had a conference on November 9th, following which SCRG wrote a letter saying we agree, even though not ordered, we agree to pay 50% of the costs. And now they're complaining about it. Now they want the court to reverse their own agreement? How does the court do that? We get back to jurisdiction. Where does the court get jurisdiction to reverse their voluntary agreement to do something? Furthermore, Your Honor, everything that they argue is moot. This is an appeal of Judge Finch's order. Judge Finch said you've got to pay half the costs. This court stayed that order. As it turns out, they wound up paying half the costs anyway, pursuant to Judge Cannon's order, pursuant to the directions on remand. But the payment of the costs was done pursuant to Judge Cannon's order, pursuant to instructions from this court. Judge Finch's order was stayed by this court during that relevant period. So if we determine that Judge Finch's order was an inappropriate order because it was an injunction and a bond was not posted, is it appropriate for us at this time to order the posting of a bond under Judge Finch's order is a part of our consideration? I think that's what the court could do if it came to the conclusion it had jurisdiction, appellate jurisdiction. I believe that's within the parameters of the scope of what the court can do. But I wish to reiterate our position is also that this issue is moot. So lack of appellate jurisdiction, first. Voluntary payment by SCRG, second. Mootness, the payment wasn't done pursuant to Judge Finch's order. There was a change in circumstances during the pendency of this litigation, including pendency of the appeal, which resulted in the payments being done pursuant to Judge Cannon's order on their agreement. All right. Thank you. Thank you very much, Your Honors. We give you an extra three minutes and 45 seconds. Thank you, Your Honors. Much appreciated. Bolt. Good morning, Your Honors. Kimberly Bolt here on behalf of Bennington Group. I'd like to start with some comments about the first issue on appeal, which is this notion, and Judge Smith, you addressed it briefly, the concept of the Florida litigation and what effect the Florida litigation had. We believe, and it's our position as we've stated in our briefs, that it is very, very clear that the Florida proceeding was a very narrow, very limited issue that the trial court in that proceeding looked at on a summary proceeding without having an evidentiary hearing pursuant to a Florida statute. Well, when you're looking at contracts, you don't necessarily need an evidentiary hearing. That's true. But the issue was, is this arbitrary? Is St. Croix – may they be forced to arbitrate? Yes, Judge. And if they were a signatory of the contract, they would be forced. If they were not a signatory to the contract, they would not be forced. Exactly. And you aren't a partial signatory to a contract. So in finding they didn't sign the contract, the court said they don't need to arbitrate, and inherent in that finding was that they were not a signatory to the contract. And how can you say in any respect that they are? We're not claiming they're a signatory to the first contract. Okay, so they are not party to the sales contract. Do you agree? They are not a signed – they are not a signatory. Okay. Let me be careful. I want to be careful about the way I choose my words. Do you have a party to a contract who doesn't sign it? No, I'm not suggesting that. Okay. But our argument goes much further than that because as the court is well aware, we do have a signed contract by St. Croix Renaissance Group with Bennington Group. The demolition contract. The demolition or dismantling contract, however it's being referred to. There is no question but that when you look at these two documents together, they are related to one another. The document that Your Honor is referring to that St. Croix Renaissance did not sign refers to them repeatedly by their full corporate name. Repeatedly. So there is – it will be undisputed, it is undisputed, that this contract has a connection to the contract which they did sign. Now the interesting fact, for purposes of the Florida litigation, the contract that they did sign does not have an arbitration provision. It's the contract that they didn't sign that had the arbitration provision that Bennington was seeking to arbitrate. I mean if you look at the course of this case and you just look at the equities of what occurred, we obviously have a dispute over this particular piece of property and the scrap metal that's on this property. Bennington takes what would be a logical step and files an arbitration proceeding. St. Croix goes to Miami and says, we're not a party, we don't want to arbitrate. Bennington loses that issue. Okay, fine, you don't want to arbitrate, let's go to the district court in St. Croix and let's file a lawsuit and we'll proceed with the litigation there. But there was nothing – so the history of it plays out in a logical sequence. But there was nothing about that Florida proceeding where the issue before the judge was the broader issue of whether there's a contractual relationship between these parties. Except that St. Croix Renaissance Group is not a party to the sales contract. Correct, correct. So now when we then get to the argument here that somehow that Florida proceeding precludes – I mean if I understand their argument correctly, they're asking you to reverse and enter a judgment in their favor, that there's no claim here. Frankly, that issue I think is something that would go to the trial in the merits. And the point that concerns me the most is how can you issue an injunction in a case where you're dealing with strictly monetary damages? And that brings us to the next point. So I do want to address that for your honor. The record in this case demonstrates that we're dealing with a very, very unique type of business here. I was hoping you'd get to that. Ms. Bolden. I understand your case on the merits to include the contention that Bennington suffers here or has at stake here a potential loss of reputation that would constitute irreparable injury. Is that right? Yes, Judge. And in fact, I don't think this Court has spoken to that as a basis for injunctive relief. The Fourth Circuit has. We have not. But excuse me, but I think back to my younger days as a country lawyer when one of my clients was a scrap metal dealer. And it's hard for me to think of a more fungible product, frankly, than scrap metal. So enlighten me here on how you can make the case for loss of reputation when it would be easy to cover scrap metal some other way and then seek monetary damages. But that's just it. I think when you look at the testimony, it is the type of scrap metal that is at issue, and it is the client's Bennington. What type is it? It varies, and the technicalities of it I will confess to being not able to comment on with any great certainty. But it is metal that I do know is used in the production of steel mills across the world. It is metal that is shipped to places like India and places where you have to keep the plant operating because if the plant stops operation, the items that are used to keep the plant operating will actually solidify. And if you don't keep the scrap metal coming so that the plant can stay operating, the plant actually shuts down. Is any of this in the record? Yes, sir, I believe that it is because I believe in even— irreparable harm in the absence of an injunction being issued. Well, it would be Mr. Shaw's testimony. I mean, and he testified. He could not testify as to any particular client who was expecting to buy any metal, as to any particular metal that was expected to be any particular part, and this is only a small part of all the metal there, and as to any particular destination or to the fact that when he was saying his reputation would be harmed, if it had been in fact harmed, that would have occurred several months prior when the initial shipments of the scrap didn't go out. And that if there was going to be damage to his reputation, it had already occurred, hadn't it? Well, but the district court specifically found that because he was continuing to make the promise of I will deliver, I will deliver, that if he could deliver that— But he could continue to make the promise that I will deliver, I will deliver when he knew that there was litigation preventing those deliveries. But, Your Honor, I think what you glean from his testimony is he had to make every attempt to do that or it would completely be lost. I mean, so you have— But what I don't glean from his testimony is that he testified anywhere to this issue of cover that I just brought up a little bit ago, that he was not able to obtain from some other source the product to cover these obligations. And, Your Honor, to the extent that that's missing and if the court believes that the absence of evidence that there couldn't— that there was no type of cover resolves this issue, then obviously we will be bound by the court's decision in that regard. If that evidence is significant to the court's position, to the court's ruling, ultimate ruling in the case, and it's not there, then— Well, isn't that giving you the second bite of an apple? We say, you know, we say there is an inadequate record and you say, oh, gee whiz, I didn't realize that. Let me put in some more evidence. You know, when you're reviewing an injunction, you look at the record as it exists. I agree. I agree, Judge. And if what you're asking— if what you're asking me is would we go back and seek another injunction, I mean, at this particular point in time, particularly since it's been stayed, I mean, talk about mootness on one sense. You know, we—at this point, realistically, if the injunction is lifted, the case should just proceed to trial on the merits, which I think addresses one of the other points that you were raising in connection with the Florida litigation and its impact on everything. Because clearly, all that we have on review here today is a motion that we filed requesting an injunction which was granted. You know, so to the extent that my opponents are trying to somehow suggest that this court— like I said, that this should be reversed for a judgment in their favor, I think goes well, well, well beyond what the court has under consideration today. But I think that overall, you know, our position is— and especially when you look at the Pappen case, which is a case out of the Third District, Third Circuit, I understand that it involves trademark infringement. But when you look at the basis of that case, what they're really saying is why is trademark infringement something that's subject to an injunction? And it's because what you're losing is your goodwill in the product. It's loss of the product's goodwill. And we contend that that's very similar to what we have here. And obviously, whether the court believes that the facts support that legally or not is really the crux, I think, of the issue that's before the court today. Thank you very much, Ms. Coyle. Rebuttal, Mr. Clark. Very briefly, Your Honor. I want to call the court's attention to the fact that not only is St. Croix not a part of the contract as per the Florida litigation, either is Bennington. And they went to nail the, you know, put additional nails in their coffin on rehearing by bringing the specifications contract in, and the court considered that as well and came to the same conclusion. Neither one of them are parties to either of those two contracts. And with respect to the last point made with respect to the injunctions, the Blackwater case is very instructive. It's one of the most interesting perspectives I've seen on preliminary injunctions and reviewing them, going through it. But one of the things that's pointed out in that case is, of course, the complete inapplicability of those doctrines to what is here a damage case. And if I can make this one last point, not only, Judge, did we not get a bond on the first time it was called a preservation order. When it was called an injunction, we didn't get a bond either. The court had something in there about they'll do the right thing. The fact of the matter is that's not the way it works. And we believe properly the problem with the preliminary injunction entered by the court and the preservation order as well are the findings of fact and conclusions of law which really determine the case and really present us with a beacon theory problem. Well, our review of findings of fact is at a very different level than our review of conclusions of law or legal proceedings. And sometimes we try to do things by the most economical way. Yes, ma'am. Thank you. Thank you very much. Thank you to all of counsel. We will take the matter under advisement. And we'll call the case then of United States of America v. Esbunt and DeGrasse. Thank you very much.